Kottmyer, Diane M., J.
INTRODUCTION
The plaintiff, West Concord 5-10-1.00 Store, Inc. (“West Concord”), individually and on behalf of others similarly situated, filed this action against defendant Interstate Mat Corporation (“Interstate Mat”), pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §227 (the “TCPA”). The TCPA prohibits the use of a telephone facsimile machine, computer or other device to send an unsolicited advertisement to a tele *59 phone facsimile machine and provides a private right of action to recover $500 as damages for each violation. On May 22, 2012, West Concord filed a motion, pursuant to Mass.R.Civ.P. 23, seeking certification of a class consisting of “all persons in Massachusetts who were successfully sent a facsimile” offering Anti-fatigue Floor Mats from Interstate Mat. In support of this motion, plaintiff alleges that in May of 2005, the advertisement was sent by fax to over 1,000 persons in Massachusetts without prior permission. For the following reasons, the plaintiffs Motion for Class Certification is denied.
THE RECORD
A. Interstate Mat and B2B
In 2006, Interstate Mat was a small family-owned business that employed five persons, including its owner and president Victor M. Cucinotta (“Cucinotta”) and his son Brian. Interstate Mat was engaged in selling floor mats to businesses. On or about April 18, 2006, Interstate Mat received an unsolicited facsimile from an entity known as Business to Business Solutions (“B2B”) offering to draft advertisements (“ads”) for Interstate Mat’s products and send them via facsimile to potential customers. B2B was a d/b/a of Caroline Abraham (“Abraham”) who testified that she collected payments for and did fax advertising for two Romanian companies. (Plaintiffs Ex. B, 11/20/11 Abraham Dep. at 15, 22-24 (“the Sparkle Hill Dep.”).)
Cucinotta responded to B2B by fax and provided information to be used in composing the ads and in identifying potential customers to whom ads would be sent. B2B faxed sample ads to Interstate Mat for approval. Cucinotta then corrected and approved the ads and agreed to pay B2B $438 in exchange for their faxing the approved ads to 10,000 companies. The companies to which the ads were sent were selected by B2B. After identifying the types or categories of businesses to be targeted by the ads, B2B obtained fax numbers of such businesses within particular zip or area codes from a database it had purchased. Abraham 12/28/10 Declaration, ¶7 (Ex. 3 to Ex. B to Plaintiffs Motion). Cucinotta never saw the list of companies. He was not aware that sending such faxes violated the law. Cucinotta Dep. at 9-10, 24-26 (Plaintiffs Ex. A). Interstate Mat did not receive any complaints from companies that received the fax. id. at 31. Interstate Mat ultimately paid B2B a total of $496.40 based on B2B’s representation that the ads would be faxed to 12,000 companies. B2B successfully faxed an Interstate Mat advertisement to 8,416 unique fax numbers, 1,600 of these were received in Massachusetts.
B. Anderson Wanca, Bock & Hatch, Abraham and B2B
Plaintiff is represented by two Illinois law firms, Anderson Wanca and Bock & Hatch, assisted by local counsel. In support of this motion, plaintiff submitted a number of exhibits, including a deposition of Abraham taken on November 20, 2011, in a case plaintiffs attorneys filed against Interstate Mat in federal court on behalf of an entfiy named Sparkle Hill, Inc.[2] Exhibits to plaintiffs motion also include a deposition of Abraham taken on November 16, 2010, in two consolidated Superior Court cases, Michael Collins v. Lock & Keys of Woburn, Inc., Suffolk Civil Action No. 07-4207, and National Vocational Schools of Boston, Inc. v. Locks & Keys of Woburn, Inc., Suffolk Civil Action No. 10-1918, Ex. 5 to Plaintiffs Ex. B (the “Locks & Keys Dep.”). In a Declaration dated November 15, 2009, that is Ex. C-18 to the Locks & Keys deposition, Abraham states that B2B is a company she operates out of her home. Her son Joel, a college student, assists with computer issues. In January of 2009, Abraham received a subpoena from Anderson Wanca in one or more of four cases (identified by name in the Declaration) which were then pending (the “original cases”). In the Declaration and in her deposition testimony, Abraham states that Joel produced a physical hard drive and two backup CD-ROMs to Ryan Kelly, an attorney from Anderson Wanca. (Sparkle Hill Dep. at 167-69; Abraham Declarations dated 12/28/10, ¶4 (Ex. 3 to Ex. B), and 11/15/09, ¶5 (Ex. C-18 to Ex. 5 to Ex. B to Plaintiffs Motion). Abraham testified that, in addition to records relating to the four original cases, the hard drive and CD-ROMs contained copies of ads and lists of fax numbers for many other businesses on whose behalf ads were faxed by B2B and that
Anderson&Wanca’s representative, Ryan Kelly, gave his word that (A) none of the information on the physical hard drive will be used for any other purpose except as evidence in those four cases; and (B) nobody will even look at any of the information on the physical hard drive not directly connected with those four cases.
Abraham 11/15/09 Declaration, ¶5.
In the Sparkle Hill deposition at 136-38, Abraham testified that she also understood that the two backup discs were to be used only in the original cases, that she was told explicitly that the information on the discs would not be used for other cases, but that the information had been used in other cases and “as a result, there have been many dozen, perhaps hundreds, I don’t know how many, and I’ve done many, many depositions since then based on information in those [computer records] ...” Abraham went on to provide names of cases pending in multiple states in which she had been deposed.[3]
On or about November 24, 2010, Anderson Wanca’s Ryan Kelly asked computer expert Robert Biggerstaff to review records and to report “any opinions regarding those records and any fax transmissions recorded in those records related to Interstate Motor (sic).” Biggerstaff Report, Ex. C to Plaintiffs Motion, ¶6. On February 25, 2009, Kelly had given Biggerstaff a DVD-ROM labeled “FAXING (1,2,3) 060715.” Id., ¶9. This CD-ROM is one of the two backup discs turned over to Kelly by Abraham’s son Joel in the original cases on or about January 9, 2009. Abraham 12/28/10 Declaration ¶4 (Ex. 3 to Ex. B to Plaintiffs Motion). Biggerstaff retrieved from that disc records showing *60 that B2B sent Interstate Mat’s ads to 8,416 unique fax numbers. Biggerstaff Report, ¶12.
C. West Concord
One of the faxes sent by B2B on behalf of Interstate Mat was successfully transmitted to the plaintiff West Concord, another small family-owned business. West Concord did not solicit the fax and did not give Interstate Mat permission to send the fax. Christopher M. Curtis n (“Curtis”) is a Vice President and the manager ofWest Concord. At some point, Curtis received a letter from Anderson Wanca, was intrigued and called the law firm. Curtis Dep. at 25 (Ex. D to Plaintiffs Motion). Curtis testified that the name Interstate Mat was familiar to him, but his knowledge that West Concord received a faxed Interstate Mat advertisement is based on his review of a list provided to him by Anderson Wanca. Id. at 29-31. Curtis does not recall what he did with the original fax. Id. at 21-22, 41, 43. Thereafter, Anderson Wanca filed three class actions under the TCPA in addition to this case, in which West Concord was a named plaintiff: a suit against an entity called Design Ideas that West Concord settled individually, a suit against an entity called DKB that settled, and a third case that was dropped. Id. at 16-19.
THE TCPA
The TCPA, enacted in 1991, prohibits the use of “any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine.” 47 U.S.C.A. §227(b)(l)(C). The following exceptions apply: 1) where a prior business relationship exists between the parties; or 2) the recipient voluntarily makes its fax number available for public distribution. 47 U.S.C. §227(a)(4).[4]
Congress provided three avenues of enforcement of the prohibition on sending unsolicited faxes: 1) enforcement by the Federal Communications Commission; 2) a civil action by the Attorney General of a state, or official or agency designated by a state, on behalf of its residents, to recover for the greater of actual monetary loss or $500 for each violation, trebled in the Court’s discretion for willful or knowing violations and/or injunctive relief; and 3) a private action brought by a person or entity, “if otherwise permitted by the laws or rules of court of a state,” in an appropriate court of that State for injunctive relief and for recoveiy of the greater of actual monetary loss or $500 in damages for each violation, trebled in the Court’s discretion for willful or knowing violations. 47 U.S.C. §227{b)(3), (f).
With respect to the private right of action, Senator Ernest Hollings (“Hollings”), the TCPA’s original sponsor, stated in support of its passage:
The [TCPA] contains a private right-of-action provision that will make it easier for consumers to recover damages from receiving these computerized calls. The provision would allow consumers to bring an action in State court against any entiiy that violates the bill . . . It is my hope that States will make it as easy as possible for consumers to bring such an action, preferably in small claims court...
Small claims court or a similar court would allow the consumer to appear before the court without an attorney. The amount of damages in this legislation is set to be fair to both the consumer and the telemarketer. However, it would defeat the purposes of the bill if the attorney’s costs to consumers of bringing an action were greater than the potential damages. I thus expect that the States will act reasonably in permitting their citizens to go to court to enforce this bill.
137 Cong. Rec. S16204-05 (Nov. 7, 1991) (emphasis added) (hereinafter “Remarks of Sen. Hollings”).[5]
MASSACHUSETTS SMALL CLAIMS PROCEDURES
In Massachusetts, the legislature has provided in the District Court Department of the Trial Court “a simple informal and inexpensive procedure” for the resolution of claims in contract or tort in which the claim for damages does not exceed $7,000 (with the exception of claims for property damages arising out of a motor vehicle accident). G.L.c. 218, §21. The filing fee for small claims of $500 or less is $40. Representation by attorneys is unnecessary. Instructions and forms for filing and prosecuting such claims by pro se litigants are available on-line and in the clerk’s office of each District Court.
RULE 23
Under Mass.R.Civ.P. 23(a), a plaintiff seeking certification of a class must show that (1) the class is sufficiently numerous to make joinder of all parties impracticable; (2) there are common questions of law and fact; (3) the claim of the named plaintiff representative is lypical of the claims of the class; and (4) the named plaintiff will fairly and adequately represent the interests of the class. In addition, a plaintiff must show that common questions of law and fact predominate over individualized questions, and that the class action is superior to other available methods for fair and efficient adjudication of the controversy. Mass.R.Civ.P. 23(b). Although the plaintiffs bear the burden of establishing that the class meets the requirements of rule 23, this burden must be construed within the framework of the broad discretion judges have to grant or deny a motion for certification. Weld v. Glaxo Wellcome, Inc.,434 Mass. 81, 84-85 (2001). The plaintiffs bear the burden of providing information sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements of rule 23; they do not bear the burden of producing evidence sufficient to prove that the requirements have been met. Id. A judge deciding a motion for class certification may consider the fact that denial of class status may effectively terminate a proceeding or the fact that the grant of class status may, in the defendants’ view, pressure them to settle. These factors alone, however, should not be determinative of a motion to certify a class. Id. at 94. ‘The predominance and superiority requirements introduce a highly dis- *61 cretionaiy element.” Carpenter v. Suffolk Franklin Sav. Bank, 370 Mass. 314, 318-19 (1976).
DISCUSSION
A. Rule 23(a) Factors
The class, over 1000 recipients of the faxes, is sufficiently numerous to make joinder impracticable. Common questions of fact and law also exist. See Spear v. H.V. Greene Co., 246 Mass. 259, 266 (1923) (the interest of each prospective class member must arise from “a common relationship to a definite wrong”); M. Berenson Co., Inc. v. Faneu.il Hall Marketplace, Inc., 100 F.R.D. 468, 470 (D.Mass. 1984) (Rule 23 “requires that questions of law and fact be shared by members of the prospective class, but not every question raised need be common”). Further, the requirement of typicality is also met in that the injury suffered by plaintiff and the putative class members arises from the same course of conduct, receipt of an unsolicited fax, and the claims are based on the same-legal theories. See Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 606 (1985) (A plaintiff representative normally satisfies the typicality requirement with “an allegation that the defendant acted consistently toward the [representative and the] members of a putative class”); In re Bank of Boston Corp. Sec. Lit., 762 F.Sup. 1525, 1532 (D.Mass. 1991) (“The claims of a named plaintiff are considered to be typical of the class when the plaintiffs injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims, and when plaintiffs claims and those of the class are based on the same legal theory”). It is less clear that the named plaintiff has the ability and the incentive to vigorously represent the claims of the class. This is the fourth case he has brought; two of the other three were settled, at least one individually, and the third has been “dropped.”
B. Rule 23(b) Factors
In determining whether common questions of law or fact predominate over questions affecting individual members, the Court is required to examine the questions of law and fact that are likely to arise with respect to each of the remaining claims. “Although common questions need not be dispositive of the entire class action, . . . their resolution should at least provide a definite signal of the beginning of the end.” Fletcher v. Cape Cod Gas Co., 394 Mass, at 603, quoting Mertens v. Abbott Laboratories, 99 F.R.D. 38, 41 (D.N.H. 1983). In examining this issue, this Court should look closely at whether the issue of liability can be decided on a class-wide basis. See id. at 604. In addition to receipt of the fax, proof of liability will require each plaintiff to establish that the exceptions to the prohibition do not apply, e.g., the absence of a prior relationship with Interstate Mat and that the business does “not voluntarily make its fax number available for distribution.” These are fact questions that will have to be resolved on an individual basis. It is therefore not clear that common questions of fact predominate.
In examining whether a class action is superior, this Court must look at “other available methods” and determine whether a class action is superior to those methods to accomplish “the fair and efficient adjudication of this controversy.” Mass.R.Civ.R 23(b). As illustrated by the following example, a class action is clearly not superior in this case, Le., a fair and more efficient method of adjudicating plaintiffs claims.
In support of this motion, counsel submitted several decisions of the Superior Court certifying classes in similar cases, including the consolidated cases, Michael Collins v. Lock & Keys of Woburn, Inc., Suffolk Superior Court Civil Action No. 07-4207, and National Vocational Schools of Boston, Inc. v. Locks & Keys of Woburn, Inc., Suffolk Superior Court Civil Action No. 10-1918 (Ex. E to the Plaintiffs Motion for Class Certification). The plaintiff also submitted as an exhibit in support of this motion a deposition of Abraham taken in those cases (Ex. 5 to Ex. B).[6] The two firms and local counsel that represent the plaintiff in the present case were among Class Counsel in that case. There, they filed a Motion and Memorandum in Support of Final Approval of Class Action Settlement (the “Motion”). They recite that the class consists of 14,383 individuals and entities who were sent faxes on behalf of the defendant [by B2B] (Motion at 7). According to the motion, settlement was reached with the defendant’s insurer, pursuant to which a settlement fund of $2,000,000 was created. Id, at 3. Each class member (identified in computer expert Robert Biggerstaffs Report) “will be entitled to claim a pro rata share, up to $500 per advertising fax they received,” and the plaintiffs will each receive an incentive payment of $15,000 “to compensate them for the time and effort they have expended on this case.” Id. at 3, 5. The plaintiffs and their insurer “agreed not to oppose Class Counsel’s request for attorneys fees of one-third of the Settlement Fund ($666,666.67) and agreed not to oppose Class Counsel’s request for costs and expenses not to exceed $65,000.”id. at5. Counsel represented that the fees were reasonable given the complexity of the case and represented that the total lodestar calculation of their fees was $729,898. Motion at 17. Notice was sent to class members by mail and facsimile (presumably unsolicited) and only one objection was received.
The portion of the Settlement Fund available to satisfy claims of class members in the Locks & Keys case is $1,238,334 ($2,000,000—$666,666— $65,000—$30,000). If each class member seeks recovery for each unsolicited fax received, the recovery will be approximately $86 per fax. Thus, only if class members seek recovery for less than 2,700 of the total of over 14,383 faxes sent (less than 20%) will class members receive the same amount that they would have received if they filed in the District Court ($500— $40 filing fee; more for those who received more than one fax, e.g., $1000—$40 or $960). Notwithstanding the representation that “[t]he settlement . . . represents a potential 100% recovery for the Class," Motion *62 at 8, the settlement apparently works because veiy few of those entitled to recover will actually submit a claim. The conclusion is inescapable that these class actions exist for the benefit of the attorneys who are bringing them[7] and not for the benefit of individuals who are truly aggrieved as a result of receiving the faxes.
As to efficiency, as justification for substantial attorneys fees, the Locks & Keys Motion describes four years of litigation, extensive discovery, including multiple depositions, the retention of experts, a detailed analysis of voluminous documents, novel issues relating to the amount of coverage available under an insurance policy, extensive briefing on the issue of class certification and summary judgment motions. Motion at 2-3. Settlement is advocated because class actions have “a well deserved reputation for complexity,” litigation would require “a significant commitment of time and financial resources,” and the settlement “avoids the uncertainty and, length of time and high costs associated with continuing this hard-fought litigation . . . and will minimize the inevitable costs of future litigation of this matter.” Motion at 9.
In contrast, the issues presented in these cases are not complicated. An aggrieved private person presumably has retained possession of the offending fax. Although an intermediary was used to send the fax in this case, a defendant whose products were advertised would be hard-pressed to deny its role in causing the facsimile to be sent. The issue in each individual case is not simply whether a facsimile was sent, but whether one of the exceptions applies, including whether the recipient had a prior business relationship with the sender and whether the recipient voluntary made its fax number available for public distribution. These facts are in the possession of the individual plaintiffs. The filing fee for small claims in the District Court is $40, service may be accomplished by certified mail and representation by an attorney is unnecessary.
Federal courts relying on the Advisory Committee Notes to the 1966 Amendments to the cognate federal rule have identified as a factor pertinent to superiority the question whether certification “will bring about other undesirable results.”[8] In ruling on motions to certify a class in cases in which the damages significantly outweigh the actual harm suffered, federal courts[9] have identified the potential that certification would encourage the use of the law as a device for the solicitation of litigation as one such undesirable result.[10] Spikings v. Cost Plus, Inc., 2007 U.S.Dist. Lexis 44214 (C.D.Cal. 2007) (Potential for abuse by attorneys in cases in which there is an enormous contrast between liability and actual harm is an additional reason why class action is not superior to individual actions under Fair and Accurate Credit Transactions Act (“FACTA”)); Torossian v. Vitamin Shoppe Industries, 2007 U.S.Dist. Lexis 81961 (C.D.Cal. 2007) (same).
There is no question that the defendant’s potential liability is such that a certification order would have the potential for “ruinous liability” for a small business like Interstate Mat and create inordinate pressure to settle, factors which the Supreme Judicial Court has also recognized are pertinent to the superiority of a class action.[11] Weld v. Glaxo Welcome, Inc., supra, 434 Mass, at 94. Between this case and the Sparkle Hill case pending in federal court, Interstate Mat’s exposure is in excess of $4,000,000 (8,416 faxes multiplied by $500).
To the extent that it is argued that a class action is consistent with the Congressional intent to deter the sending of unsolicited faxes, courts have recognized that Congress sought to achieve a balance by creating a specific personal remedy that could easily be obtained in a local court and establishing a level of damages that would provide incentive for those aggrieved by the receipt of unsolicited faxes, but be proportional to the harm caused.[12] See LocalBaking Products, Inc. v. Kosher Bagel Munch, Inc., 421 N.J.Super. 268, 23 A.3d 469, 476-77 (N.J.App. 2011) (by providing for a statutory award of $500 which far exceeds any real or sustained damages, Congress provided an aggrieved party incentive, which, combined with the availability of small claims procedures in New Jersey courts “suggest that the benefit of a class action has been conferred on a litigant by the very nature of the procedures employed and relief obtained”); Kim v. Sussman, 2004 WL 3135348, n.l (Ill.Cir. 2004) (in enacting the TCPA, “Congress clearly did not intend to cripple individuals and entities using broadcast facsimile transmissions to solicit business—Where, as here, Congress has designed a statutory scheme to incentivize the holder of such a claim to file suit, the necessity of invoking a class action to redress these alternative claims is diminished”). See also Spikings v. Cost Plus, Inc., supra (in suit under FACTA, superiority requirement is not met where defendant’s liability would be enormous and completely out of proportion to any harm suffered by the plaintiff); Torossian, supra (“putting a company out of business for failing to excise the expiration dates from credit card receipts as required by FACTA, especially without proof of actual harm, is the type of undesirable result that the Advisory Committee and the Ninth Circuit warned against”). Moreover, the TCPA, by providing that the Attorney General of a state may sue and may seek injunctive relief, as well as punitive damages for willful and knowing violations, addresses concerns that a recalcitrant defendant will avoid accountability.
This suit exemplifies the undesirable results identified in the federal cases. There is an enormous contrast between Interstate Mat’s potential liability and the actual harm suffered by potential class members. Before he was contacted by Anderson Wanca, plaintiff did not file this or any of the other three lawsuits brought by these firms on his behalf and no other recipient of the Antifatigue Floormat faxes had complained to or filed suit against Interstate Mat. Anderson Wanca received materials in the course of discovery in four unrelated cases brought pursuant to the TCPA and used those materials to *63 identify and then solicit plaintiffs to bring suit against other defendants, including Interstate Mat. Plaintiffs counsel has used the TCPA as a device for the solicitation of litigation and Rule 23 as a device to generate legal fees in cases in which the attorneys have a far greater interest and stake in certification of a class than the putative class members.
ORDER
For the reasons stated herein, the plaintiffs motion for certification of a class is denied. Further, because, as a matter of law, there is no reasonable likelihood that the damages recovered by plaintiff will be equal to or in excess of $25,000, the case is dismissed. See G.L.c. 212, §§3, 3A.

The case, Sparkle Hill, Inc. v. Interstate Mat Corporation, Civil Action 11-10271, filed by Bock & Hatch is currently pending in the United States District Court for the District of Massachusetts. By decision dated December 18, 2012, in which she noted that it was a close question, the District Court allowed the plaintiffs’ motion to certify a class. The class in that case is apparently composed of businesses outside of Massachusetts to which B2B sent Interstate Mat’s ads via facsimile.

Abraham testified inconsistently as to whether she had received payments, other than witness fees, from Anderson Wanca. In the Sparkle Hill deposition, Abraham testified that she had not received any payments from Anderson Wanca other than witness fees, 11/20/11 Dep. at 148, 150-51, although she testified that on one occasion an attorney for her son Joel received a check in the amount of $5,000 from Brian Wanca which the attorney returned. Id. at 148-50. In the Locks&Keys deposition dated November 16, 2010, at 161-62, Abraham had testified that she never dealt personally with Brian Wanca, but that (in addition to the $5,000 check described above) she had received “a lot of checks signed by him,” “twenty plus or minus.” Asked why she was receiving checks from Mr. Wanca, Abraham stated: “They claimed it was for my time in providing evidence for them. Also when I first talked to them, I was a little teed off that they had . . . subpoenaed me for information and wasting' my time at all in the first place. So I asked them to be paid for my time.” Id. at 162. During the deposition, Abraham identified checks and a list of checks received from Wanca or his firm that were marked as Ex, C-15, 16 and 17 to the deposition [but not submitted in this case] and added that the checks were for her time and for producing documents. Abraham further testified that after June or July of 2009, when she realized that she was being asked for documents in cases other than the four original cases based on information gleaned from the hard drive and CD-ROMs, she did not cash another check. Id. at 163-64.

An unsolicited advertisement is defined as any material advertising the commercial availability or qualify of any property, goods or services which is transmitted to any person without the recipient’s prior express invitation or permission. 47 U.S.C. §227(a)(5).

Plaintiff relies on Mims v. Arrow Financial Services, LLC, 132 S.Ct. 740 (2012), as authority for the unremarkable proposition that the views of a single legislator, even the sponsor of a bill, are not controlling. In Mims, the issue presented was whether federal courts had subject matter jurisdiction over private actions arising under the TCPA. Relying on Senator Hollings’s statement, the defendant argued, and the District Court affirmed by the Eleventh Circuit had held, that Congress vested exclusive jurisdiction over private TCPA actions in state courts. The Supreme Court stated that the reliance on Senator Hollings’s statement was misplaced, holding that nothing in the language of the statute or in Senator Hollings’s statement suggested that Congress made state court jurisdiction exclusive, or otherwise purported to oust federal courts of jurisdiction under 28 U.S.C. §1331. The Court did not suggest that courts should not consider such statements by legislators in considering whether class actions were superior to other available remedies. Whether the legislative objective is better served by a class action is a relevant consideration in determining superiority.

While Massachusetts case law limits judicial notice of court records to papers in related cases, see Jarosz v. Palmer, 436 Mass. 526, 530 (2002), I find that by submitting as exhibits to the Motion to Certify a Class, and relying on, the decision certifying the class in the Locks & Keys cases and Abraham’s deposition therein, the plaintiff has treated those cases as related cases and I have taken judicial notice of the pleadings and papers in those cases.

As of November of 2011, Class Counsel represented that they had been appointed class counsel in “dozens” of TCPA class actions. Motion at 8.

The Advisory Committee Notes to the 1966 Amendments to Federal Rule 23, 39 F.R.D. 69, 102-03, provide in part:
Subdivision(b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

Reliance on federal case law is especially appropriate in this case which involves enforcement of a federal statute.

In Buford v. American Finance Co., 333 F.Sup. 1243, 1251 (N.D.Ga. 1971), an action under the Truth in Lending Act, the Court stated:
[M]any claims which simply did not exist have been brought to life by our courts through the judicial act of allowing a class action to be maintained. Although some courts say these claims are not brought because plaintiffs believe the potential recovery would be too small to justify the time and expense of litigation, the plain truth is that in many cases Rule 23(b)(3) is being used as a device for the solicitation of litigation. This is clearly an undesirable result which cannot be tolerated.

 With respect to the issue of “ruinous liability,” to the extent that the existence of insurance coverage is a factor in pursuing these cases, as stated by the Court in Kim v. Sussman, 2004 WL 3135348, n.l (Ill.Cir. 2004), a TCPA case in which a motion to certify a class was denied:
It is no answer. . . that defendant’s insurance carrier may ultimately be obligated to cover the amount of the judgment in this case. The availability of insurance for a particular claim does not enter into the analysis of whether a class action is the appropriate method for adjudication of the controversy. Further, the possibility of passing the loss onto another entity that could, in turn, raise premiums, draft exclusions or decline future coverage altogether has its own ramifications which counsel against class certification in this case.

As stated by Senator Hollings: “The amount of damages in this legislation is set to be fair to both the consumer and the telemarketer.” Remarks of Senator Hollings (emphasis added).

This decision amends the decision issued on February 12 and docketed on February 14, 2013.